## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **AIR COMFORT INC.,** | § | |
| **Appellant,** | § | |
| **vs.** | § | **Case No. 1:08-cv-202-LG-RHW** |
| | § | **Appeal from U.S. Bankruptcy Court** |
| **FRIEDE GOLDMAN HALTER, INC,** | | |
| **THE CONSOLIDATED FGH** | § | |
| **LIQUIDATING TRUST, etc.,** | | |
| | § | |
| **Appellee.** | | |

---

### BRIEF OF APPELLANT AIR COMFORT INC.

---

Gregory C. Buffalow
Kenneth W. Steely
Attorneys for Appellant

OF COUNSEL:

MILLER HAMILTON SNIDER & ODOM LLC
254 State Street
P. O. Box 46
Mobile, Alabama 36603

**Corrected Copy**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

Basis of Jurisdiction.................................................................................................1

Issues Presented for Review ....................................................................................1

Standard for Review .................................................................................................1

Statement of the Case...............................................................................................2

Statement of the Facts..............................................................................................3

       Contract Terms.................................................................................................4

       Ordinary Course of Business ...........................................................................5

       Standard Deviation.........................................................................................10

       Unsuccessful, Post Payment Collection Efforts.............................................11

       New Value ......................................................................................................12

       Effect of Prior Court Order .............................................................................14

       Application of Separate Defenses to each Check .............................................14

       Settlement and Ratification.............................................................................15

       Estoppel...........................................................................................................17

       Creditor Earmarking .......................................................................................18

       The Remuneration Agreement.........................................................................21

Argument and Legal Authorities.............................................................................23

I. Remand is required because the Trustee did not sustain its burden of proof regarding insolvency at the times the checks were issued. ...............................................................................23

II. The trial court should be reversed for failure to properly analyze the defense involving payment in the ordinary course of business, and apply case law on point......................................................24

III. Although the trial court correctly found that the two checks in issue were subject to setoff or extension of new value, it committed reversible error in denying application of the new value defense by its erroneous legal conclusion that the extension of new value could be reduced by post-petition payments from a third party, Ocean Rigs, made pursuant to one or more court approved Agreements. ..................................................................................................................................................33

IV. Application of alternative defenses, even under the trial court analysis, require reduction in the award to $214,267.97....................................................................................................................39

V. The trial court recognized but failed to follow case law which should sustain the defense asserted by Appellant on ratification and *de facto* assumption, and failed to enter sufficient findings of fact and conclusions of law to address the evidence of delivery of the rigs, and completion of the contracts, and §365 of the Act..........................................................................................................................................40

VI. The trial court discussed creditor earmarking primarily in the context of post-petition payments pursuant to a Remuneration Agreement, and did not fully consider the evidence that a third party Ocean Rigs had been earmarking its payments to Friede Goldman from the fall of 2000 forward which would have encompassed, and protected, the two checks written in January 2001...........43

Conclusion and Relief Sought ..........................................................................................................45

Signature ...........................................................................................................................................45

Certificate of Service ........................................................................................................................46

Appendix.............................................................................................................................................47

    A. Complaint

    B. Answer

    C. Amended Answer

    D. Decision denying summary judgment

    E. Trial Decision

    F. Order entering Judgment

    G. Notice of Appeal

    H. Docket Sheet in trial court

## TABLE OF AUTHORITIES

A. CASES.

Barnhill v: Johnson, 503 U.S. 393 (1992)..........................................................................30

Gulf City Seafoods Inc. v. Ludwig Shrimp Co., 296 F. 3d 363 (5 Cir. 2002).............31, 32

Home Sewing Center Inc., 173 B.R. 782 (N.D. Cal. 1993)...........................................6, 27

In re Ameri P.O.S. Inc., __ B.R. __, 2006 WL 3231274 (Bankr. S.D. Fla.,
Oct. 24,  2006) .........................................................................................................26, 27

In re Big Wheel Holding Company, 223 B. R. 669 (Bankr. D. Del. 1998). ......................33

In re Cherrydale Farms, 2001 WL 1820323 ....................................................................... 31

In re Forklift LP Corp., 2006 WL 2042979 (D. Del. July 20, 2006) .................................29

In re Formed Tubes, 46 B.R. 6435 (E.D. Mich. 1985) .....................................................37

In re GGSI Liquidation Inc., 313 B.R. 770 (N.D. Ill. 2004) ..........................................6, 27

In re Grabill Corp., 135 B.R. 101 (Bankr. N.D. Ill. 1991) .................................................43

In re Global Tissue, 106 Fed Appx. 99 (3 Cir. 2004) ..................................................27, 30

In re H.L. Hansen Lumber Co., 270 B.R. 273 (C.D. Ill. 2001)......................................6, 27

In re Hayes Lemmerz Int'l., 337 B.R. 49 (D. Del.  2006).................................................28

In re Hechinger Investment Co., 326 B.R. 282 (Bankr. D. Del. 2005) ..............................33

In re IRFM, Inc., 52 F. 3d 228 (9 Cir. 1995).....................................................................36

In re J. Allen Steel Co., 321 B.R. 764 (Bankr. W.D. Penn. 2005)...................23, 26, 30, 32

In re JKJ Chevrolet, Inc., 412 F. 3d 545 (4 Cir. 2005). ....................................................36

In re Kroh Bros., 114 B.R. 658 (W.D. Mo. 1990) ......................................................30, 37

In re Micro Innovations, 185 F.3d 329 (5 Cir. 1999)............................................30, 33, 34

In re Moltech Power Systems, 327 B.R. 675 (Bankr. N.D. Fla. 2005)...............................29

In re New York City Shoes, 880 F. 2d 679 (3 Cir. 1989) .................................................30

In re Nettel Corp., Inc., 2006 WL 3392940 (Bankr. D.C. Nov. 21, 2006) .......................25

In re Plunk v. Yaquinto, 481 F. 3d 302 (5 Cir. 2007) ............................................................1

In Re SGSM Acquisition Co., 439 F 3d 233 (5 Cir 2006)................................6, 26, 31, 39

In re Terry Mfg. Co., 332 B.R. 630 (M.D. Ala. 2005) .......................................................31

In re Thomas Garland, 19 B.R. 920, 6 Collier Bankr. Cas. 2d 1259, 8 Bankr. Ct. Dec. 1357 (E.D. Mo. 1982) ....................................................................................................................33

In re Thurman Constr., Inc., 189 B.R. 1004 (Bankr. M.D. Fla. 1995)...............................37

In re Tolona Pizza Products Corp., 3 F. 3d 1029 (7 Cir. 1993) .........................................28

Kapela v. Newman, 649 F.2d 887 (1st Cir. 1981) .............................................................44

Matter of Toyota of Jefferson, Inc., 14 F. 3d 1088 (5 Cir. 1994) ..........................34, 35, 36

MMR Holding Corp. v. C&C Consultants, 203 B.R. 605 (M.D. La. 1996)....35, 38, 42, 43

Mosier v. Ever-Fresh Foods Co., 144 B.R. 886 (C.D. Cal.1992) ......................................35

Molded Acoustical Products, Inc., 18 F. 3d 217 (3 Cir. 1994) ..............................28, 29, 30

Steinberg v. NCNB Nat'l Bank of N.C. (In re Grabill Corp.), 135 B.R. 101, (Bankr. N.D Ill. 1991).................................................................................................................................44

Winter Haven Truss Co., 154 B.R. 592, (M.D. Fla. 1993) ................................................26

## B. STATUTES AND RULES.

11 U.S.C. § 158 .....................................................................................................................1

11 U.S.C. § 365 ..........................................................................................................Passim

11 U.S.C. § 546 ...................................................................................................................36

11 U.S.C. § 547(b)......................................................................................................Passim

11 U.S.C. § 547(c).......................................................................................................Passim

Bankruptcy Rule 8001 ............................................................................................................1

Bankruptcy Rule 8013 ............................................................................................................1

## C. OTHER AUTHORITIES

Am Jur Bankruptcy §2338. ....................................................................................................41

4 Collier on Bankruptcy, ¶547.12 (15th Ed. 1992)................................................................35

18A, Federal Practice, §4453 *Preclusion by Consent and  Estoppel by Conduct* (2002)...38

18A, Federal Practice, §4454, *Representation – In General* (2002). ...................................38

Klee and Butler, *The Bankruptcy Abuse Prevention and  Consumer Protection Act of 2005 – Business Bankruptcy Amendments*, at 10. ........................................................................28

Restatement (Second) of Judgments §24 (1982)...................................................................38

Westlaw Commercial Bankruptcy Litigation Database (Updated Oct. 2006), Ponoroff, Snyder, Ch. 10 at §10:10 "Property of the debtor."............................................................43

## BASIS OF JURISDICTION

The Court has jurisdiction from a timely appeal to District Court from a final decision of a Bankruptcy Court pursuant to 28 U.S.C. § 158, 158(a) and 158(b), and Bankruptcy Rule 8001.

## ISSUES PRESENTED FOR REVIEW

1. Whether the Trustee sustained its burden of proof of insolvency.

2. Whether reversal is required for failure to apply the law concerning the payment in the ordinary course of business defense.

3. Whether reversal is required because the new value defense was denied due to an erroneous legal conclusion that the extension of new value was reduced by post-petition payments from a third party, Ocean Rigs, made pursuant to one or more court approved Agreements.

4. Whether application of alternative defenses to each check, even under the Trust analysis, would reduce in the award to $214,267.97.

5. Whether the lower court recognized but failed to follow case law that the payments were protected by ratification, *de facto* assumption, or §365 of the Act.

6. Whether the payments were protected by creditor earmarking.

## STANDARD FOR REVIEW

Findings of fact are reviewed for clear error, and conclusions of law are considered *de novo*. In re Plunk v. Yaquinto, 481 F. 3d 302, 305 (5 Cir. 2007). The reviewing court may affirm, modify, or reverse the decision, or remand with instructions. Bankruptcy Rule 8013.

1

## STATEMENT OF THE CASE

Air Comfort appeals an award to the Liquidating Trustee for Friede Goldman of $413,057.00 based on a claim of preferential transfer arising under 11 USC §547(b) of the Bankruptcy Code.

Suit was filed on or about April 14, 2003,[1] seeking recovery on two (2) checks; the first dated January 19, 2001, in the amount of $150,319.49, and the second dated January 29, 2001, in the amount of $400,200. The Trial Court determined the reconcile dates for the two transfers, January 25 and February 5, 2001 respectfully, were within 90 days of the April 19, 2001 Bankruptcy petition (Decision, p.5 n.5).

On February 3, 2004 the Liquidating Trustee was substituted as a Plaintiff for Friede Goldman Halter Inc. and its official Unsecured Creditors Committee[2]. Defendant Air Comfort filed an Answer on May 28, 2003[3], incorporated various defenses including contemporaneous exchange for new value, and payment in the ordinary course of business. Air Comfort filed a Motion to Amend its Answer on or about February 9, 2007[4], and the Amended Answer was permitted by Order dated March 21, 2007[5]. The Amended Answer was filed on or about April 20, 2007[6], adding defenses of express or implied ratification, creditor earmarking and preclusive effect (or *estoppel*) created by prior settlement agreements approved by the Bankruptcy Court.

On August 12, 2004, Air Comfort filed a Motion for Summary Judgment[7] based on new value, and ordinary course of business. Plaintiff filed a Response and Affidavits of Counsel.[8] On

---

1 Complaint, Doc. 1. References to docket entries are abbreviated as "Doc," Plaintiff and Defendant exhibits as "PX" or "DX," and transcript references "Tr." by date and page.
2 Order Substituting Plaintiff, Doc. 3
3 Answer, Doc. 3.
4 Motion to Amend, Doc. 17.
5 Order, Doc. 24.
6 Amended Answer, Doc. 27.
7 Motion and Brief, Docs. 5, 6.
8 Answer in Opposition to Motion and Affidavits. Docs 7 – 10.

March 31, 2006, the Court denied Summary Judgment finding material issues of fact[9]. The Summary Judgment decision indicated "Plaintiff does indicate that there remains a recoverable preference of $305,609.51." The Court noted "the Plaintiff appears to concede that it is no longer seeking recovery of the total amount of $550,521.49 asserted in the Complaint." (Summary Judgment Decision at p 4 n.1).

Trial began April 24-25, 2007, was adjourned and reconvened on August 14 - 16, 2007, and again on October 15-16, 2007. Decision was entered April 1, 2008 awarding $413,057.00[10]. This award was inconsistent with the Summary Judgment finding that the recoverable preference should not exceed $305,609.51. The trial decision did not reconcile the conflict between the two decisions.[11]

A timely Notice of Appeal to the U.S. District Court was filed on April 8, 2008[12]. Plaintiff filed a Motion for Stay Pending Appeal[13] without Requirement of Bond on April 11, 2008, and Supporting Memorandum. No decision has been entered on the Motion for Stay in the trial court.

## STATEMENT OF FACTS

The payments in issue were made to Air Comfort Inc. ("Air Comfort"), a heating ventilation and air conditioning ("HVAC") subcontractor for the Friede Goldman Halter ("FGH" or "Friede") shipyard. Air Comfort had been hired to provide labor and materials related to HVAC systems for two drill rigs under construction, known as Bingo I and Bingo II. The rigs were being built for a third party, Ocean Rigs, a foreign corporation headquartered in Norway. All of the Air Comfort work for Friede was on Bingo I and Bingo II.

---

9 Decision denying Summary Judgment. Doc. 13.

10 Decision, Doc. 34.

11 The award exceeded the Trust contention that new value limited the preference to $343,000. April 24, Tr. 21.

12 Notice of Appeal, Doc. 36.

3

## Contract terms

The Master Service Agreement[14], and Terms and Conditions[15] were admitted into evidence. The contract included a lien waiver, effective when the materials were delivered to the shipyard. Friede also waived any ownership interest in the Rigs and title was vested in Ocean Rigs from the outset. The Rigs, and HVAC materials, were never a part of Debtor's Estate. The Master Service Agreement provided that Air Comfort, as Contractor, would "permit no liens of any kind to be fixed upon or against the property of the Company or any third party." [16] It also provided that payments to Air Comfort were to be made as specified in a purchase order. The purchase order had a payment term 30 days Net[17]. The Terms and Conditions on the reverse of the FGH Form Purchase order, specified that "Payment to SELLER shall be made as indicated on this PO"[18]. The definitions section defined "PO" as a purchase order, *Id.* The FGH Terms also reinforced the waiver of liens in the Master Service Agreement by a further provision whereby title to services and goods passed immediately on delivery to FGH[19]. Consistent with the Agreements, Air Comfort filed a Proof of Claim[20] as an Unsecured Creditor for the unpaid balance on Bingo I and Bingo II. The Trustee contended Air Comfort was a secured creditor which precluded the new value defense, but treated Air Comfort as unsecured in schedules filed. The Trial Court did not resolve this issue and determined "it is not necessary to make findings regarding the lien under §547(c)(4)(A). (Decision p.14 n.14). In doing so, the Court determined that the new value defense should be rejected on other grounds involving diminution of the estate.

---

13 Motion for Stay, Doc. 37 and Affidavit, Doc. 39.

14 DX 21 b.

15 DX 21 c.

16 Master Service Agreement. DX21b at ¶2.

17 All of the purchase orders are included in DX11.

18 Terms and Conditions DX21c at p.058.

19 Terms and Conditions, DX 21c at p. 059

4

## Ordinary Course of Business

The complete history of billings and payments by Friede and third party Ocean Rigs, the rig owner, were presented in spreadsheets admitted into evidence by all parties.[21]  The invoice approval process was consistent, whereby an invoice could not be processed until completion of the stated percentage of work had been approved by a Project Manager.  Friede counsel stipulated that this approved process was consistently followed throughout Air Comfort's work on Bingo I and Bingo II prior to and in the preference period[22].  The Project Manager never received instructions to expedite payment of Air Comfort[23].  The President of Friede testified no instruction was ever given to expedite payment to Air Comfort[24], and testified he received no special favors from Air Comfort[25].

The ordinary course of business defense required a determination if frequency or timing of payments to Air Comfort varied significantly in the preference period 90 days prior to bankruptcy, as compared to the pre-preference period.  This involved the range of days from invoice to check, and check reconcile date, and a comparison of the weighted averages of the time between approval of an invoice and reconciliation of a check in payment of that invoice.  The weighted average analysis prepared by Friede Goldman, indicated a weighted average from invoice date to reconcile date was 45.98 days in the preference period, *versus* 41.52 days in the pre-preference period. (FGH Analysis, DX 5).  A nearly identical weighted average prepared by Air Comfort indicated 45.98 days to reconcile date in the preference period and 41.53 days to reconcile date in the pre-preference period

---

20 Proof of Claim, DX 35.

21 Air Comfort admitted an ordinary course analysis, DX 4; New Value Analysis, DX1; and a similar ordinary course analysis was prepared by the Trustee, DX 5.  Air Comfort also accounted for the manner in which post-petition payments from Ocean Rigs were applied, DX 6a.

22 April 24 Tr. 82 – 83.  References to the transcript ("Tr") are made by date and page.

23 Cagnolatti, April 24 Tr. 163 -164.  Nor did Air Comfort receive or pursue any "special treatment." *Id.*

24 According to Shepherd, there were no pre-petition memos or instructions to expedite payments to Air Comfort (Oct. 15 Tr. 149 – 150).

(DX 4). The Friede expert on ordinary course of business, former Friede President Robert Shepherd, admitted the 4 day difference in the weighted averages was not significant. "It is not that significant, no."[26]  Case law also indicates a difference up to 4, 5, 6,  or 8 days, or 10% of the parties previous range, is not indicative of a preference[27.]

Both Friede Goldman and Air Comfort witnesses testified concerning the range of payments from invoice to check reconcile date from spreadsheets.  Both parties' spreadsheet agreed that the range of payments extended from 38 to 51 days in the preference period, and ranged 32 to 58 days in the pre-preference period[28.]  The same ranges were confirmed in the Air Comfort spreadsheet[29]  Considering these ranges at trial, the Trial Judge observed "these numbers, 50 days or 54 days do not a preference make to me."[30]   This should have required decision in favor of Air Comfort.

Testimony was presented that the experience of payments between Air Comfort and Friede of 38 to 51 days in the preference period, was consistent with the parties prior course of dealing, and consistent with the shipyard industry in the U.S. Gulf.  Captain Michael H. Barrie, a qualified marine surveyor with experience in processing and payment of shipyard invoices, provided expert testimony that the payments to Air Comfort in the preference period were both consistent with the prior course of dealing between Friede Goldman and Air Comfort,[31] and consistent with the shipyard industry in

---

25 Shepherd (Oct. 15 Tr. 73 – 74).

26 Shepherd (Oct. 15 Tr. 46).

27 *See* discussion *infra*  In Re SGSM (4 days not significant); H.L. Hansen Lumber (5 days or 10% not significant); Home Sewing (6 days not significant); In Re GGSI  (8 days not significant).

28 Friede Spreadsheet DX 5

29  Air Comfort spreadsheet DX 4.

30 Judge Gaines comment (Aug. 15 TR. 245).

31 The preference payments were all within the ranges set between the parties previously (Barrie, Aug. 14 Tr. 216-217), and processing payments 4 days slower in the 90 days prior to bankruptcy did not indicate a preference (Barrie Aug. 14, Tr. 219).

the U. S. Gulf.[32]  He found it significant that all of the checks in the preference period were written within 45 days[33], and observed the amount of time for the checks to clear was not unusual.[34]

The evidence established the industry custom for a Net 30 payment term, such as Friede purchase order, was that the vendor would typically expect the check to be written within 30 - 45 days of the invoice.  Additional time would be required for the check to clear or reconcile.  Captain Barrie testified that the broadest range which would be considered normal would be 23 days on the low end and 63 days on the high end[35].  In other words, payment of a Net 30 invoice in less then 23 days or in more than 63 days would be considered aberrant or extreme.  Payment in the 23 to 63 day period would be consistent with the shipyard industry in the U. S. Gulf and the 32 to 58 day period between Friede and Air Comfort[36.]

Captain Barrie's found it consistent with industry custom that all of the checks in the preference period were written within 45 days from the date of invoice[37.]  This was also consistent with the 32 to 58 day range asserted by the Friede representative Mr. Shepherd.[38.]  Mr. Shepherd acknowledged that this period additional time could be extended a few days[39], and also acknowledged that the range of payments in the pre-preference period, between 32 – 58 days from invoice, was entirely consistent with the ordinary course of business in the industry on the U.S. Gulf

---

32 These payments were consistent with the industry (Barrie, Aug. 14 Tr. 220) as none exceeded the upper range for payment of a Net 30 invoice (Barrie, Aug. 14 Tr. 209 – 210).  All the preference payments were within a 32 – 58 day range which both he and Mr. Shepherd opined were "generically consistent with . . . the industry on the Gulf Coast." (Id., Tr. 206).

33 Barrie Aug 14 Tr. 213 – 214 and all but 3 were written in 45 days in the pre preference period (Id.,Tr. 211).

34 Barrie Aug 14 Tr. 216 – 217, referring to his chart DX 32c which found 82.4 % in both periods.

35 Barrie Aug. 14 Tr. 209 – 210 reflecting a 23 – 68 day range.

36 Barrie Aug. 14. Tr. 206 – 207, 220 – 221.

37 Barrie Aug. 14. Tr. 211 – 212.

38  Barrie Aug. 14. Tr. 206 – 207, 220 – 221.

39 The 30 – 45 day range can be extended by other factors such as a weekend (Shepherd, Oct. 15.

7

Coast. Reading from his report, Mr. Shepard admitted the following:

> The pre-preference payments made by Friede Goldman to Air Comfort are generally
> consistent with the ordinary course of business in the industry on the Gulf Coast.

(October 15 Tr , p 45 referring to his report PX 20). As of the payments in the preference period

were within this range which was consistent with the U. S. Gulf.

Mr. Shepherd agreed the range of payment terms typical in the industry and in the U. S. Gulf,

included net 30 days, net 45 days and even net 60 days[40.] Similar factual testimony was presented by

Lillian Rodriguez Davis, the Accounts Payable Manager for Rodriquez Brothers Shipyard, that Net

30 invoices are customarily paid within 30 to 45 days from invoice,[41] and that sometimes payment

would be extended out to 60 days. Anything over 60 days would be considered aberrant or

extreme[42.] The former Accounts Payable Clerk at Friede Goldman agreed that typical payment terms

in the shipyard industry included payment terms of Net 7, 10, 30, 45 and some Net 60 terms[43.] This

was consistent with Air Comfort's experience with other Gulf shipyards, in which their invoice aging

ranged from 30, 45 to 60 days[44].

Similar testimony was presented by Air Comfort's Karen Arnold that payment of Net 30

invoices in U. S. Gulf shipyards ranged from 30 to 60 days[45]. As she put it, the broadest range that

was considered normal was 30 to 60 days. The former Controller of Friede Goldman also testified

---

Tr. 39 – 40).

40 Discussing Net 45, Net 60, even Net 90, Shepherd Oct. 15 Tr. 41 – 43.

41 Lillian Rodriquez Davis in charge of accounts payable between 1999 – 2001 (April 25 Tr. 279, 281) testified to a 30 – 45 day range (Id.,Tr. 300) at the Rodriquez yard.

42 The payment range could be extended (Rodriquez Davis, April 25 Tr. 301) and range out to 60 days old (Id.,Tr. 303).

43 Krebs April 24 Tr. 131. She noted Air Comfort collection calls were no different in the preference period (Tr. 134).

44 Dina Mclendon, April 24 Tr. 148 – 149.

45 Karen Arnold, April 25., Tr. 336 – 339, with the average time lag 30 to 60 days (Id.,Tr. 339).

that payment terms ranged out to 60 days from invoice in his experience[46]. Even Friede's witness Mr. Shepard acknowledged that the 30 to 45 day period could be extended by circumstances such as the day of the week the check was written, and the time required for checks to clear.

No foundation was presented for the Friede representative, Mr. Shepard, to challenge testimony from Captain Barrie or Lillian Rodriquez Davis concerning the broadest range of payments in the industry which would be considered normal, up to 60 or 68 days, because Mr. Shepherd could only address payment terms generally,[47] and had no basis to testify concerning what a specific yard would consider acceptable for a reconcile date on a check. He had no knowledge of the shipyards listed by Captain Barrie,[48] and was not familiar with Rodriquez.[49] The following testimony from Mr. Shepard is significant:

> I can address the ordinary course of payment terms are in the industry. I can't say what a specific yard would accept for a reconcile date on a check. I can tell you what would be acceptable to me as a shipbuilding executive in business that I ran. I can tell you what the ordinary course, in general, what was acceptable in the industry, but I can't specifically talk to individual yards because I just couldn't.

(August 16 Tr. p 485).

Given the limited foundation for Mr. Shepherd, the Trustee could not rebut more specific testimony from Captain Barrie that the broadest range of payments from date of invoice, considered normal in U.S. Gulf shipyards, ranged from 23 to 68 days. Nor could Mr. Shepard rebut similar testimony from Karen Arnold concerning a 30 to 60 day range she had actually experienced with similar customers in Gulf area, or rebut the 60 day range experienced by the Rodriquez yard. The Trial Court nevertheless concluded Air Comfort did not meet its burden of proof on ordinary course

---

46 Andrews, Aug. 14 Tr. 67, "It could be terms from Net of receipt to 60 days."
47 He had never qualified as an expert before (Aug. 16. Tr. 435) and his knowledge was limited to payment terms in contracts (Aug. 16 Tr. 443, 455 – 456).
48 He was unfamiliar with Bender (Aug. 16 Tr. 457), Harrison (Id), and limited his knowledge to Atlantic Marine (Tr. 459).

of business. This finding should be reversed for clear error.

The regularity of the payment routine to Air Comfort in the preference period was also illustrated by contrast with Friede records of payments to other Bingo I and Bingo II vendors, which illustrated some unusual or extreme variance in payments to other Net 30 vendors in the preference period. For example, SECO Industries received payments 79 days from invoice, Timco received payments 100, 113 and 127 days from invoice (DX 10 at p. 037,043, 044). These payments were idiosyncratic or aberrant, and no doubt constituted preferences[50.] The trial court did not enter specific findings on the ordinary course of business issue, or address the evidence that the payments in issue were in conformity with ordinary business terms, both at Friede Goldman and in the industry, that the payment term could range as far as 60 days from invoice.

## Standard Deviation

The trial court, instead, entered a cursory finding that Air Comfort had not met its burden of proof (Decision, p. 20). The court credited a standard deviation analysis which, earlier, was indicated to be of little benefit[51.] During trial, the court overruled objections to testimony from Mrs. Robinson, an attorney for the Liquidating Trust concerning the standard deviation analysis which had not been provided in discovery responses[52.] The Court also overruled objections based on the lack of

---

49 Aug. 16 Tr. 457.

50 Friede attempted to suppress this information and it was necessary to file a motion to compel to obtain it (Doc. 16), and Friede refused to provide complete data (*id*), omitting the reconcile dates for the checks to other vendors. The limited information from invoice to check date is contained in PX 11 and summarized at PX 10.

51 It was incredible the decision credited the Microsoft Excel standard deviation (Aug. 15 Tr. 335) because at trial the witness admitted she had not used it in Court (Aug. 15 Tr. 340). The Judge clarified it was not expert testimony (Aug. 15 Tr. 344) and said "There is no way any human being could understand that." (Aug. 15 Tr. 336).

52 Trial testimony of Mrs. Roberson arguing a range of 37.03 to 46.01 days based on standard deviation (Aug. 15 Tr. 377) should have been excluded because these ranges were not in the report submitted prior to her deposition (Aug. 15 Tr. 354). The Court excluded new pages for DX 18 and limited the exhibit to the document supplied at deposition (*Id*.,Tr. 356) but

10

relevant industry experience for Mrs. Robinson who was an attorney, with no in house shipyard experience.[53]. This evidence should have been excluded. Further, there is no nothing in the Act to approve use of a standard deviation analysis.

In the court's limited analysis of ordinary course of business, it was considered unusual that the invoice Net 15 term was at variance from the purchase order Net 30 term (Decision, p.20). These boilerplate forms followed a consistent pattern in the preference *versus* pre-preference period, and Friede consistently treated the Net 30 term as controlling. Nevertheless, the Court considered this to be a significant factor. The Decision overlooked the priority provision of the Master Service Agreement which provided that, in the event of a conflict, the purchase order Net 30 terms would prevail.[54]

## Unsuccessful, Post Payment Collection Efforts

The decision referenced unusual collection efforts, including a lien claim and stop payment order. The undisputed evidence at trial indicated, however, that there were no additional payments made by Friede Goldman to Air Comfort after the lien claim or stop payment notice[55]. The January 2001 checks in were issued prior to these efforts. The lien claim and stop payment were in March. There was also a collection call by Mr. Brett Babineaux of Air Comfort in February to the President of Friede Goldman which had no bearing on payments[56.] Mr. Shepherd also acknowledged the

---

nevertheless allowed verbal testimony (*Id.*, Tr. 377).

53 Objection was overruled that she was not qualified as an expert in the shipyard industry with any experience in payables or receivables (Aug. 15 Tr. 369-371, 372). She was never employed in payables at Friede (Aug. 15 Tr. 386 – 387).

54 Master Service Agreement, PX 21b at last paragraph.

55 Mr. Shepherd could not identify any invoices that were paid as a result of the Lien claim (Oct. 15 Tr. 148) or stop payment order (Oct. 15 Tr. 149).

56 Mr. Shepherd could not identify any payments made as a result of the meeting (Oct. 15 Tr. 148).

11

meeting was quite professional, and that there were no demands made by Air Comfort[57]. After the fact collection efforts, which resulted in no additional payments by Friede, should have had no impact on the decision.

**New Value**

Air Comfort continued to provide goods and services after receipt of both January 2001 checks. After the $150,319.49 first check was reconciled on January 25th, Air Comfort delivered and invoiced for goods and services in the amount $398,957.24. After the $400,202.00 second check was reconciled on February 5th, Air Comfort delivered goods and services in the amount of $421,492.97. This was recognized in the decision below (Decision, p.7), and established in a spreadsheet prepared by Air Comfort's Karen Arnold (DX 1 at pp 1, 3).

The new value defense was primarily contested on the issue whether new value should remain unpaid, or whether it could be paid by a third party, without affecting the defense.

The Trustee contended that the new value from Air Comfort was diminished from funds that were paid post-petition pursuant to a settlement agreement between Ocean Rigs and FGH (Decision at p. 7 citing Remuneration Agreement, DX 21d). This payment by Ocean Rigs to Air Comfort was after the January 2001 checks from Friede Goldman. Most of the funds generated pursuant to the settlement agreement were disbursed pre-petition[58]. The money paid to Air Comfort by Ocean Rigs under this agreement was disbursed post-petition. Friede contended the payment was made, in effect, with Friede's money. Air Comfort denied the payments should not reduce new value because the payments were made by Ocean Rigs, a third party, because the wire transfer[59] and check[60]

---

57 Mr. Shepherd agreed Mr. Babineaux was quite professional (Oct. 15 Tr. 69) and there was no refusal to provide goods and services (Oct. 15 Tr. 70), no request for change in payment mode (Id.,Tr. 71), no request for new security (Id.,Tr. 72), and no change to a cash basis (Id.,Tr. 73).
58 Shepherd, Oct. 16 Tr. 174- 175.
59 Ocean Rigs wire transfer DX 46, Oct. 15 Tr. 168.

reflecting these payments confirmed payment from Ocean Rigs, and because payments were made pursuant to settlement agreements entered between Air Comfort and Ocean Rigs (but bearing no signature or indication that Friede Goldman was involved)[61]. The payments should not reduce new value, in any event, because the payments were made post-petition.

Two payments from an Ocean Rigs account were involved in the issue whether new value was arguably reduced by post-petition payments. The first was a check from Ocean Rigs in the amount of $61,765.79 (DX 45) paid pursuant to a settlement agreement between Air Comfort and Ocean Rigs dated April 20, 2001 (DX 13). The second involved a $750,000 wire transfer from Ocean Rigs (DX 46) pursuant to a settlement agreement between Air Comfort and Ocean Rigs dated July 2, 2001 (DX 42). Copies of the cancelled check and a certified copy of documentation of the wire transfer were introduced at trial. (DX 45 - 46). Both payments were after the January 2001 checks identified in the Complaint. At trial, it was argued any claim for recovery of the $61,765.79 or $750.000.00 as a post-petition preference was time barred, and Mr. Shepherd said Friede was not claiming the money back [62] Air Comfort also objected to any claims to the $61,765.79[63] and $750,000 by the Trustee because it was not addressed in the Trustee's responsive pleadings.

The Trial Court agreed that the checks or wire transfers were from Ocean Rig accounts (Decision, p. 10), referring to it as payment by Ocean Rigs, but nevertheless concluded that the new value defense was inapplicable because the effect on the estate was to diminish the new value that had been extended (Decision, p. 14). The Court refused to address whether the Trustee's claim to the $750,000 was time barred.

---

60 Ocean Rigs Check DX 45, Oct. 15 Tr. 165.
61 Bingo I Settlement Agreement, DX 13; Bingo II Settlement Agreement DX 42.
62 Shepherd, Oct. 16 Tr. 175 – 176.

## Effect of Prior Court Order

The Bankruptcy Judge had previously approved the Remuneration Agreement and a series of Agreements between Friede Goldman and Ocean Rigs, finding that the agreements were beneficial to Friede, the creditor, and indeed, to all parties in interest. (Order approving delivery, DX 19). All parties had received notice of the Motion to Approve Settlement (DX 19 at ¶ 2), and the Order should have been *res judicata* and prohibited any collateral attack on funds disbursed pursuant to the Remuneration Agreement. Alternatively, because of the settlement agreements and delivery of the Rigs were found to be beneficial to all parties in interest, the Trial Judge was *estopped* by its prior ruling to later conclude that the Remuneration Agreement, or payments by Ocean Rigs in any way harmed or diminished the Estate.

## Application of Separate Defenses

The effect of payments by Ocean Rigs, even if applied to reduce new value, would eliminate an offset for the $150,319.49 first check,[64] but would reduce the new value offset for the $400,202.00 second check to $198,789.03.[65] Air Comfort exposure on the second check would be limited to $201,412.97. Here is should be noted that the Court could apply separate defenses to each check. While Air Comfort does not abandon its contention, that both checks should be protected by an ordinary course, new value or other defense, the exposure of Air Comfort should be reduced to $214,267.97 even if the trial court acceptance of the Trustee's interpretation of ordinary course and

---

63 Aug. 14 Tr. 103, Aug. 16 Tr. 604 – 607.

64 A spreadsheet provided by Air Comfort (DX 6a) provides an accounting how the Ocean Rigs payments were posted. This Exhibit indicates that the following invoice numbers were paid by Ocean Rigs and would be deleted from the new value reduction for the first check. Invoice numbers 30854-30160, 30915-30916, 30926, 30959-30961, 30978 and 30979.

65 The spreadsheet accounting for Ocean Rigs payments of invoices (DX 6a), also indicates that the following invoices would be reduced from the new value offset on the second check; Invoice numbers 30964, 30966, 30977, 31052-31056, 31085, 31105 and 31172. These invoices would be subtracted from the second check new value, DX 1 at p. 02.

14

new value is affirmed.

With respect to the January 19th first check, assuming *arguendo*, a 45 day period provides an absolute cutoff, Air Comfort would lose the benefit of the ordinary course of business analysis for only the first three invoices paid by the initial check in the preference period. Here, the first three invoices were paid in 51 days to the reconcile date. The remainder of the invoices covered by the January 19th check were 45 or less to the reconcile date. This would reduce the $150,319.49 check by only the first three invoices paid within 51 days, which were in the amounts of $10,062.00, $2,185.00 and $608.00 respectively[66.] The end result would be that $137,464.49 was protected. Under this analysis, Air Comfort would have exposure of only $12,855.00 on the first check.

With respect to the January 19th second check, as noted above, the effect of payments by Ocean Rigs, if applied to reduce new value, would reduce the new value offset for the $400,202.00 second check to $198,789.03.[67] Air Comfort exposure on the second check would be limited to $201,412.97. Applying the Friede's 45 day analysis to the first check with $12,855.00 exposure, and Friede Goldman's new value analysis to the second check with $201,412.97 exposure, the maximum award, even under the arguments advanced by the Trustee, should not exceed $214,267.97. The Decision below made no analysis of the potential application of separate defenses in its summary conclusion that Plaintiff should have judgment in the amount of $413,057.00, although the argument was presented that the Court could apply separate defenses to each check.

### Settlement and Ratification

There was documentary evidence that Friede, with approval of Court, ratified all payments by Ocean Rigs, ratified disbursement to vendors, ratified completion and delivery of Bingo I and Bingo

---

66 The amounts of these invoices are shown in DX4, at p. 012.
67 The accounting for Ocean Rigs payments of invoices (DX 6a), confirms the following invoices would be reduced from the new value offset on the second check; Invoice numbers 30964, 30966,

15

II, and in so doing, effectuated a *de facto* or implied Ratification of the Contract to build and deliver Bingo I and Bingo II. Prior to and after filing for Bankruptcy relief, FGH entered into a series of agreements with Ocean Rigs, as follows: Settlement Agreement dated January 18, 2000 (DX 21p); Cooperation Agreement dated November 30, 2000 (DX 21o); Remuneration Agreement of March 9, 2001 (PX 32b); and a Delivery and Close Out Agreement dated December 10, 2001 (PX 6). The intent and effect of these Agreements was to approve all previous payments on the Bingo I and Bingo II, including direct payments by Ocean Rigs to vendors, or payments which had been directed by Ocean Rigs. The last of the Agreements was entitled Delivery and Close Out Agreement of December 10, 2001, (PX 6),which was approved by the trial court and the same Judge who heard the evidence in this case.

The Order approving settlements (DX 19, 20), and the Agreements, were an express or implied ratification of the Bingo I and Bingo II contracts; ratification and approval of all previous payments to or work performed by Air Comfort; or in the alternative were *de facto* ratification. The Remuneration Agreement of March 9, 2001 (PX 32b) approved all previous payments made on Bingo I and Bingo II. There was a conditional waiver of claims by Ocean Rigs[68], and identical conditional waiver of claims by FGH[69.] A Later Delivery and Close Out Agreement of December 10, 2001 (PX 6), the last of the agreements between FGH and Ocean Rigs, contained similar language but the waiver of claims was no longer conditional. [70] This later agreement specifically ratified all previous payments made by Ocean Rigs direct to vendors.

---

30977, 31052-31056, 31085, 31105 and 31172.
68 PX 32b at ¶ 1.1.
69 PX 32b at ¶ 2.1.
70 PX 6 at ¶¶1.1 and 2.1. This amounted to issue preclusion so that the trial decision could not properly conclude the new value was reduced by subrogation, or other interest in favor of Ocean Rigs or other party.

The specific language regarding payments to vendors stated, "Ocean Rigs agrees ... to waive all accrued liquidated and other damages ... increased costs (including, but not limited to subcontractor or supplier claims asserted directly against Ocean Rig), FGO/FGH's use of contract proceeds ... revenue or profit...." [71] The Agreement, further, specifically ratified the delivery of Bingo I and Bingo II, and ratified the completion of any contractual or other obligations of FGH for construction and delivery of the rigs. This more specific ratification language with respect to Bingo I and Bingo II provided as follows:

> The Parties hereby confirm that Bingo 9000-1 was delivered by FGO/FGH to Ocean Rig 1 AS on 28 September 2001 and that Bingo 9000-2 was delivered by FGO/FGH to Ocean Rig 2 AS upon departure of Bingo 9000-2 from FGO's facility in Pascagoula, Mississippi. Accordingly the Parties hereby agree that FGO/FGH shall owe no further obligations to Ocean Rig with respect to construction and outfitting of Bingo 9000-1 and Bingo 9000-2 as more particularly described in the Completion Contracts (as amended).

(Delivery and Close Out Agreement, PX 6 at ¶ 5.1, pp 5-6). This Agreement also resulted in withdrawal of a Proof of Claim by Ocean Rig and Order Expunging Ocean Rigs Proof of Claim (Court order, September 23, 2004. DX 20).

### Estoppel

The foregoing Delivery Agreement also required approval of Bankruptcy Court and "[t]he Parties ... best endeavors to obtain approval of this Agreement by the Bankruptcy Court."[72]. Court approval was subsequently entered on May 16, 2002[73]. The Order approving the Delivery and Close Out Agreement stated, in part, that "the contracts between the FGH Entities and the Ocean Rigs Entities are completed and the parties wish to finalize outstanding matters between them" (DX 19, Order, May 16, 2002 at ¶4, p. 2). It was also recognized by the Court that the 2001 settlement also

---

71 PX 6 at ¶ 1.1.
72 PX6 at ¶¶1.1 and 2.1.
73 DX 19.

finalizes certain pre-petition and post-petition waivers of claims (*id.*, at ¶5, p. 2). The Settlement was found to be in the best interest of FGH and its creditors and *all parties in interest (id.*, at ¶7)(italic emphasis added), and was also made binding on FGH and their creditors, including any future Trustees (*id.*, at ¶12, p. 4). The court below did not address the binding effect on the Plaintiff Liquidating Trustee although the defense was asserted that the Trustee was precluded or *estopped* from the preference action by the express language of one or more settlement agreements, and Orders approving same. (Amended Answer, Affirmative Defenses 11 – 13, 16, 17).

The prior agreements and Order also determined that FGH had no exposure to repay to Ocean Rigs any of the funds paid directly by Ocean Rigs to Air Comfort, or other vendors, in order to take delivery of the rigs, and remove them from FGH. After waivers of claim were approved, nor did Ocean Rigs have any basis to claim repayment by FGH. Consequently, payments by Ocean Rigs to Air Comfort could not, properly, be characterized as a payment diminishing the Debtor's estate, increasing a security interest, or payments secured by an otherwise unavoidable transfer.

**Creditor Earmarking**

The two checks in issue were issued in January of 2001. By that time, Ocean Rigs had been engaged in "creditor earmarking" for at least a year in directing payments to its critical vendors. There appears to be no dispute that the post-petition payments of $61,765.69 and $750,000 were earmarked by Ocean Rigs. Beginning in the fall of 2000, Ocean Rigs became directly involved in the payment of invoices for its vendors on Bingo I and Bingo II. This is important for two reasons. First, all of the Air Comfort work involved labor and materials for heating and air conditioning work on Bingo I and Bingo II. Secondly, the weight of the evidence at trial was that from the Fall of 2000 forward, or from January of 2000 forward, Ocean Rigs was directly involved in directing payments or in earmarking payments for its critical vendors. This was supported by testimony of former Friede

18

Goldman Executives as well as documentary evidence.

According to the former Project Manager for Bingo I and Bingo II, Mr. Guy Cagnolatti (now employed with Signal Shipyard), Ocean Rigs was highly involved in these projects "pretty much from the start."[74] (Tr. 163). Beginning in January of 2000, or the Fall of 2000, Ocean Rigs became even more involved. In fact there came a time when Ocean Rigs became in involved in directing payments for vendors to the extent that it would not supply funding to Friede Goldman without proof that the money would be used for its vendors and for no other purposes in the yard. Proof of payment was required in order to receive funds from Ocean Rigs. According to Mr. Cagnolatti:

> I do recall at some point the customer has to provide proof of payment; in other words, it was an exchange of invoices. We have these invoices. We'll pay you and make sure the invoices were paid so that the money was not taken off site to pay the investors or whatever. They just wanted to make sure that the bills that we had to keep the job going were being paid.

(Cagnolatti, April 24, Tr. 167).

Ocean Rigs required verification their vendors were being paid, [75] particularly labor vendors[76]. As noted above, Air Comfort was a labor vendor providing labor and HVAC materials. Mr. Cagnolatti confirmed that Ocean Rigs wanted assurances that their vendors were being paid with any funds supplied to Friede Goldman. "[T]hey wanted to be assured that the bills were being paid to the contractors working on their rig for Friede Goldman.[77]" While Ocean Rigs was not that aggressive in the beginning, their more aggressive posture started in the "fall of 2000."[78] Mr. Cagnolatti explained the way the system worked:

> THE COURT: Okay. The way it would work, you are telling me Ocean Rigs would agree to pay an invoice from Friede as long as Friede understood it was to go to the

---

74 Cagnolatti April 24, TR. 166.

75 Cagnolatti, April 24, Tr. 168 – 169.

76 Cagnolatti, April 24, Tr. 168.

77 Cagnolatti, April 24, Tr. 169.

78 Cagnolatti, April 24, Tr. 169 – 171, referring to "fall of 2000" at 171.

19

people who was invoicing them?

THE WITNESS: Correct.

(Cagnolatti, April 24, Tr. 171).

In January of 2000 when the work was converted to time and materials, it was fully established that Ocean Rigs required proof that its money was being spent on labor and materials for its projects.[79]  The foregoing testimony based on Mr. Cagnolatti's direct knowledge acquired with meetings with management,[80] was also corroborated in documentary evidence introduced at trial. Beginning in January 2000 Ocean Rigs began making a series of progress payments on Bingo I and Bingo II (Settlement Agreement, DX 21p, ¶ 14 at pp 21 – 22).  As such, the progress payments were to be "dedicated and ear-marked exclusively for the payment of project expenses and for no other purpose whatsoever." (*Id.* at p 22).

Consistent with Mr. Cagnolatti's testimony, the Settlement Agreement also provided that on a monthly basis, beginning in January of 2000, Friede Goldman was required to provide a "report identifying expenditure on project expenses" for Bingo I and Bingo II (Settlement Agreement, DX 21p,¶14.1.4 at p. 22).  The required reports and regular updates included the following disciplines: Structural, Electrical Piping, and HVAC, *i.e.* Heating and Air Conditioning work of the nature performed by Air Comfort. (Settlement Agreement DX 21p. at p. 11).  The progress payments from Ocean Rigs were "earmarked exclusively" according to the agreement, to be applied to the project and for no other purpose.

A similar agreement was entered in November 2000, the Cooperation Agreement[81] , which provided for a change in the completion date for the Bingo I and Bingo II to March  2001 and June

---

79 Cagnolatti, April 24, Tr. 175-176.
80 Cagnolatti, April 24 , TR. 170 – 173.
81 Cooperation Agreement, DX 21o.

20

2001 respectively.[82]  The November 2000 Agreement also provided that Ocean Rigs would direct

payment for any times and materials work.[83].  The agreement provided for a cash infusion by Ocean

Rigs of One Million Dollars on each of the following dates: December 31, 2000; January 31, 2001;

February 28, 2001 and March 31, 2001.[84]  By this time, as noted, Friede Goldman had already agreed

that incoming funds from Ocean Rigs would be used to pay for Bingo I and Bingo II and for no other

purposes.  The November and January 2000 time frame of the foregoing agreements is directly

consistent with the testimony from Mr. Cagnolatti, summarized above, that the exchange of invoice

procedure whereby Ocean Rigs was directly involved in earmarking funds to be paid to its vendors -

- particularly labor and HVAC, was in place by the fall of 2000.  It was clear error for the Court to

conclude the payments in January 2001 were not earmarked by Ocean Rigs.

### The Remuneration Agreement

There was a later agreement entered just prior to Bankruptcy, the Remuneration Agreement

dated March 9, 2001.[85]  It should be clarified here that the January 2001 payments to Air Comfort

involved in the two checks made the subject of the preference action, were a matter of creditor

earmarking from the earlier agreements from January and November of 2000.  The later March 2001

Remuneration Agreement is significant with respect to Friede's argument that the post-petition

payments from Ocean Rigs to Air Comfort pursuant to the Remuneration Agreement was, somehow,

Friede's money.

The factual issue related to the Remuneration Agreement is whether the $61,769.69 and

$750,000.00 paid to Air Comfort in July of 2001 constituted Friede Goldman's funds even though

paid by Ocean Rigs.  It should be dispositive of this issue, that the Remuneration Agreement

---

82 DX 21o, Delivery Schedules, ¶1 at p. 0170.

83 DX 21o, at p. 0173.

84  DX 210 at p. 0178, ¶ 8.1.

21

provided in no uncertain terms that Friede Goldman had "no legal or equitable interest in the funds made available by Ocean Rigs."[86]   The relevant provision is quoted in full as follows:

> Ocean Rig agree that in consideration of full and final settlement of sums owed by Ocean Rig in respect of work carried out to date and in respect of outstanding T & M work agreed and performed by FGO/FGH prior to the execution of this Agreement, Ocean Rig shall make available US $6,2000,000 for the purpose of paying (with the advice and consent of FGO/FGH) and shall pay within 15 business days of the date hereof Past Costs (as defined in Clause 4.1) in the (but limited to) aforementioned amount.   FGO/FGH acknowledges and agree that they shall have no legal or equitable interest in the funds made available by Ocean Rig under this provision.
>
> Ocean Rig hereby agree to remunerate FGO for all future work carried out by them on the Bingo 9000-1 and the Bingo 9000-2 projects in accordance with the following provisions . . . .

(Remuneration Agreement, PX 32b at p. 0433, ¶ 3.3)

This is also relevant to the Court's analysis whether the Estate was diminished by the alleged payments to Air Comfort from the funds created by the Remuneration Agreement.  The Agreement reflects the $6.2 Million was a fair exchange for work carried out to date, and also reflects that Ocean Rigs would reimburse Friede Goldman for all future work carried out by them.  Payment for future work would replenish the Estate.   Friede Goldman received even more benefit from the Remuneration Agreement, however, because it was relieved of substantial arbitration claims for costs overruns, and additional claims for damages, which had been asserted by Ocean Rigs.  Friede Goldman received the benefit of all previous work supplied by its unpaid vendors, received funds for payment of certain vendors, obtained approval of Ocean Rigs direct payment of other vendors, and was excused from the expense of further litigation.

While Friede Goldman disputes creditor earmarking for payments made prior to the March 2001 Agreement, because no separate bank accounts were created, it is clear that by the time of the

---

85 Remuneration Agreement, PX 32b.
86 PX 32b at p. 0433, ¶3.3.

Remuneration Agreement a separate bank account was created to hold these funds. Friede Goldman's representative testifying on behalf of the Trust, Mr. Robert Shepard, confirmed that a separate bank account was created for the $6.2 million made available pursuant to the Remuneration Agreement.87

Mr. Shepard also confirmed that Friede Goldman had no copies of the cancelled check to Air Comfort for $61,765.69 paid out of Remuneration Agreement funds and that it did not have documentation in its files of the wire transfer of $750,000.00 paid to Air Comfort from Remuneration Agreement funds[88.] This is consistent with the fact that a separate bank account was created, that the account was controlled by Ocean Rigs, and that, as the Agreement reflects, Friede Goldman had no legal or equitable interest in the funds. If Friede had no copies of the checks or wire transfer, it obviously had no control of the funds. By the time payments were made pursuant to the Remuneration Agreement funds, Friede Goldman asserts it had no legal or possesory interest in the rigs, so there is no basis in the record to sustain the trial Court's determination that payments pursuant to the Remuneration Agreement diminished new value provided by Air Comfort.

## ARGUMENT AND LEGAL AUTHORITIES

### I. Remand is required because the Trustee did not sustain its burden of proof regarding insolvency at the times the checks were issued.

There is a rebuttable presumption that the Debtor was insolvent during the 90 period prior to filing bankruptcy. 11 U.S.C. §547(f). "This presumption places the burden on the creditor to come forward with evidence to rebut the presumption." In re J. Allen Steel Co., 321 B.R. 764, 768 (Bankr. W.D. Penn. 2005). The ultimate burden remains with the Trustee in this case because of the

---

87 Shepherd, Oct. 16 Tr. 204 – 205, 291.

88 Shepherd Oct. 16. Tr. 172, 174.

23

inconsistent testimony of Robert Shepherd. In deposition, Mr. Shepherd testified Friede was not insolvent at the time of the checks in issue. Reviewing his deposition, he stated "[w]e were not insolvent. I think the value of assets and receivables were greater than the debt."[89] The trial court overruled objections, and permitted Mr. Shepherd to change his story at trial to contend Friede was insolvent, despite a further statement in deposition that the witness would not be offered on the issue of solvency.[90] After considering his inconsistent statement, at trial Mr. Shepherd clarified, "In April of 2001 I did not believe we were insolvent. Sitting here today I believe we were insolvent."[91] The impeachment of Mr. Shepherd on this issue, or failure to supplement the response to his deposition, or give notice of this change should have required a greater showing than was made a trial, or have required issue preclusion as a sanction[92]

**II. The trial court should be reversed for failure to properly analyze the defense involving payment in the ordinary course of business, and apply case law on point.**

For a creditor to establish the defense that the payments were made in the ordinary course of business, a factual analysis is applied as there is no "precise legal test." The elements are summarized as follows:

> Among the factors courts consider in determining whether transfers are ordinary in relation to past practices are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and 4) whether the creditor took advantage of the debtor's deteriorating financial condition.
>
> \*       \*       \*
>
> The controlling factor is whether the transactions between the debtor and creditor, both before and during the ninety-day period, were consistent. See Lovett, 931 F. 2d

---

89 Shepherd, Oct. 15 Tr. 84 – 88.

90 Shepherd, Oct. 15 Tr. 86 – 87, quoting deposition.

91 Shepherd, Oct. 15 Tr. 96.

92 The subject of sanctions was visited at trial as the Judge threatened, briefly, to consider a perjury charge if it was proven that counsel was not telling the truth that the payment was from Friede or Ocean Rigs. Aug. 15 Tr. 389.

24

at 497. "[T]he analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day period reflected 'some consistency' with that practice. Id at 498.

In re Nettel Corp., Inc., *supra*, 2006 WL 3392940 (Bankr. D.C. Nov. 21, 2006).

The decision below discussed, in general terms, the requirements, that a creditor must show to sustain the ordinary course of business defense. First, the court agreed that the transfers to Air Comfort "were for payment of a debt incurred in the ordinary course of business pursuant to §547(c)(2)(A). The Court also discussed the general rules for an analysis of §547(c)(2)(B) and §547(c)(2)(C), including timing, amount and manner of payments (Decision, p.17) and whether the payments were consistent with the parties previous practice. (*id*). The Court also discussed the subject and objective component of § 547(c)(2)(C), whether the credit arrangements compare to similarly situated debtors and creditors in the industry, and whether the payments were consistent with ordinary business terms (Decision, pp. 18 -19).

While this was a correct statement of the general rules, the court failed to consider the evidence that the payments to Air Comfort were, in fact, consistent with prior practice and consistent with payment terms in the industry. The court failed to apply legal precedent on point that should have protected the payments in issue.

The decision also concluded without reference to any basis in the record evidence that "the time it took invoices to be paid was reduced to one half during the preference period." (Decision, p.19). This conclusion is wholly unsupported, and is at odds with the any of the parties spreadsheets. The time is required to process invoices in the preference period 38 to 51 days was consistent with and within the time required to process invoices in the pre-preference period 32 to 58 days. This is hardly cutting in half the time to process invoices. Furthermore, the Trust stipulated that the

25

procedure remained unchanged that invoices would be approved only on completion of the stated work. The finding that the time for payment of invoices was cut in half during the preference period, without more, should require the decision to be reversed as this finding is clear error.

The spreadsheets and testimony of witnesses demonstrated that the timing of the payment to Air Comfort did, in fact, demonstrate consistency with the time within which the Debtor ordinarily paid prior invoices. There are two approaches to this issue, considering a baseline range applicable to the parties, or determining an average time lag between invoice and payment.

> There are basically two approaches to calculating a baseline: (i) establish a "range" within which transactions were consummated or (ii) calculate the average lag-time between invoice and payment.

In re Ameri P.O.S. Inc., __ B.R. __, 2006 WL 3231274 at *5 (Bankr. S.D. Fla., Oct. 24, 2006). Both types of analysis support the ordinary course defense for Air Comfort.

The average time lag baseline will be considered first. The difference in weighted averages comparing the preference and pre-preference period was only 4 days. This should have disposed of the ordinary course analysis and required a decision in favor of Air Comfort. According to case law, an average difference of 4 days did not defeat the ordinary course defense in In Re SGSM Acquisition Co., 439 F 3d 233, 240 (5 Cir 2006). In SGSM the average time between invoice and payment in the pre-preference period was 21 days, and a payment in the preference period discharging invoices an average of 25.22 days old was determined to satisfy the subjective proof of §547(c)(2). Id. See also, Winter Haven Truss Co., 154 B.R. 592, 596 (M.D. Fla. 1993) (difference in weighted averages of 4 days did not constitute a preference). Likewise, an average difference of 4 days did not defeat the ordinary course defense in In re J.Allen Steel Co., 321 B.R. 764, 775 (W. D. Penn. 2005). The average interval from invoice to receipt of payment was 50.94 days, and the average in the preference period was 54.20 days. This difference of 4 days was not considered

26

significant. *Id.* In fact, a difference of 15.20 days for two isolated invoices was still not considered a departure from the industry norm "so 'gross' or 'unusual' as to place it beyond the scope of §547(c)(2)(C)." *Id.*, 321 B.R. at 776.

Similarly in In re Ameri P.O.S. Inc; 355 B.R. 876 (S. D. Fla. 2006) where the subject "payments range from one day below the average to 6 days above the average" *Id.*, 355 B.R. at 884, the Court determined the payments were made within the ordinary course. A six day difference was not so unusual as to defeat ordinary course. *See also*, Home Sewing Center Inc., 173 B.R. 782, 788 (N.D. Cal. 1993) (average difference of 6 days did not constitute a preference). Finally, in In Re GGSI Liquidation Inc., 313 B.R. 770 (N.D. Ill. 2004) the Court observed that a difference of 8 days for the average payment time in the pre preference period of 50 days, as compared to 43 days in the preference period "would not necessarily have helped" the Trustee's case. *Id.*, 313 B. R. at 776.

The ordinary course defense is not limited to a mechanical calculation of averages. Courts also resolve the issue in favor of the creditor where, as here, all of the challenged preference payments fall within the parties' previous range. In In re Global Tissue, 106 Fed Appx. 99 (3 Cir. 2004) preference payments in a 26 to 50 day range were found to be within the ordinary course between the parties where the prior history indicated a 30 to 56 day range. *Id.*, 106 Fed. Appx. at 103. The Court also accepted testimony from a Credit Manager that these ranges were customary in the industry. This decision closely parallels the evidence from Capt. M. H. Barrie, Karen Arnold and Lillian Davis Rodriguez in the Court below.

Yet another analysis of the ordinary course defense, also favorable to Air Comfort, is whether the debtor's delay in payment of invoices in the preference period exceeded by 10% its greatest delay in the preference period. In In re H.L. Hansen Lumber Co., 270 B.R. 273, 279 (C.D. Ill. 2001). In Hansen the maximum 74 day delay in the preference period therefore permitted a seven day range, or

27

maximum ordinary course of business of 81 days in the preference period. *Id.* Applying this guideline, the maximum 58 day delay from invoice to payment for Air Comfort in the pre-preference period, would allow an additional 5 days so that in the preference period all invoices paid within 63 days would be protected. This would provide a complete defense for Air Comfort because all of the preference period payments were made under 51 days, and well within the 60 day industry payment terms.

A similar analysis from In Re Hayes Lemmerz Int'l., 337 B.R. 49 (D. Del. 2006) protected the first seven transfers which were within a range of 63 to 75 days (*Id.*, at 59, 62 n.15) which were within the parties pre-preference range of 56 to 70 days with a "three-day mail float.'" *Id.,* at 54. Again, because of Air Comfort's pre-preference range of 32 to 58 days, all of the payments in the preference period paid within 51 days should be protected. This is particularly true if a three day mail float from case law is added.

The ordinary course analysis is also said to have a subjective and objective component, *i.e.*, a subjective test involving the experience between Debtor and Creditor, and an objective test involving the industry in some general way. At least one Circuit has stated the subjective analysis[93] carries the greater weight, *i.e.*, that "the most important thing is that [the dealings between the debtor and creditor] conform to the norm established by the debtor and creditor in the period before, preferably well before, the preference period." Molded Acoustical Products, Inc., 18 F. 3d 217, 223 (3 Cir. 1994). The phrase "ordinary business terms" refers to a "broad range" of payment terms in the

___

93 According to a recent paper, the 2005 amendment to $\S547(c)(2)$ which reduces the creditors burden with respect to the industry component, is merely a restatement of the prior construction of the statute in the decision, In re Tolona Pizza Products Corp., 3 F. 3d 1029 (7 Cir. 1993) which gave primary emphasis to the norms established by debtor and creditor, and would find a preference only for idiosyncratic dealings outside a very broad range. See, Klee and Butler, *The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 – Business Bankruptcy Amendments*, at 10.

28

industry. <u>Molded Acoustical</u>, *supra*, 18 F. 3d at 224. The objective evidence required with respect

to the industry is therefore quite general, requiring only a showing of a range of terms in which the

subjective experience between debtor and creditor compares in "some general way."

> Thus, the creditor is not required to prove rigorous definitions of either the industry
> or the credit standards within that industry. The creditor must establish, however, a
> "range of terms" on which "firms similar in some general way to the creditor' deal.

<u>In re Forklift LP Corp.</u>, 2006 WL 2042979 at *9 (D. Del. July 20, 2006). Under this standard, all of

the payments were well within the broad range of payment terms in the industry which extended to

Net 60. All of the payments were within the 62 day range sustained by Capt. Barrie. All were within

the 60 day maximum reported by Karen Arnold and Lillian Rodriquez Davis. The analysis of the

subjective and objective components from <u>In re Global Tissue,</u> 106 Fed. Appx. 99 (3 Cir. 2004) is

also quite similar to the situation presented by Air Comfort. The average payment to one creditor

was 51.5 days after invoice with a range of 32 – 98 days, and to a second creditor with a range of 18

– 98 days, with a 59.6 average. The appellate decision noted that after the first months of severe

delinquency "the Bankruptcy court found that payments thereafter were made typically in the 30 to

50 day range. Thus the payments in question, made 26 to 50 days after invoice, fall within this same

range." *Id.*, 106 Fed. Appx. at 102. Consequently, the finding that the payments in question were

made within he ordinary course of business established between the parties was not clearly

erroneous. *Id.*

Likewise the payments to Air Comfort represented by the two checks, easily falling within

the pre preference range from invoice date to date check, reconcile date of 32 – 58 days, should be

considered within the ordinary course of business. While <u>Global</u> refers generally to the date of

payment, it appears the inquiry is the time lag from invoice to date of delivery of the check. <u>In re</u>

<u>Moltech Power Systems</u>, 327 B.R. 675, 684 (Bankr. N.D. Fla. 2005)("The date of delivery of the

29

check determines the relevant date for purposes of the ordinary course of business exception under §547(c).") Whether the date of payment or date the check cleared is used, it makes no significant difference in the analysis and averaging of time lag and range, and at least one court applied date of receipt of the check as the standard (because it made no material difference) even though adopting the date the drawee bank honored the check as the date of transfer. *See*, In re J. Allen Steel, *supra*, 321 B.R. 764, 770 n.2. ("So doing will not alter the outcome of this case.") Other courts have determined that the date of the check should be used unless there is evidence (not applicable here) that some of the checks were postdated[94]. While Air Comfort asserts the date of delivery of the check should be used, the ordinary course of business defense is easily met whichever dates are used.

The Global Tissue analysis of the general comparison to the industry should also be dispositive. General testimony was credited that "actual payments were often made after 30 days," *Id.* at 103, and that testimony from employees of the creditor involved in the case would suffice. Noting that "information about competitors' trade practices used to establish industry standards may be difficult to obtain," it necessarily followed that "courts must allow some flexibility regarding sources of evidence used to establish the range of practices that will be deemed the industry standard in the section 547(c)(2) analysis." *Id.*, *quoting* Molded Acoustical, *supra*, 18 F. 3d at 224. Testimony from the debtor was, therefore, specifically credited.

> Contrary to the Trustee's arguments, we believe that the decision in *Chrerrydale*
> supports the notion that testimony from employees of the parties involved in a

---

94 The FGH representative Robert Shepherd acknowledged none of the checks were post dated, and there has been no suggestion that post-dated checks were used by FGH, which might, otherwise, require application of the date the check cleared. *See*, discussion of In re New York City Shoes, 880 F. 2d 679 (3d Cir. 1989) at In re Micro Innovations, *supra*, 185 F. 3d at 334 (5 Cir1999)("when the debtor pays by post-dated check payment is not made when the check is delivered but rather when the date on the face of the check arrives or when the check clears the drawee bank. *Id.* at 683-684").(No. 98-20593, 5 Cir., Aug. 13, 1999); *See also*, In re Kroh Bros., 114 B.R. 658 (W.D. Mo. 1990). *Compare*, Barnhill v. Johnson, 503 U.S. 393 (1992).

> preference payment dispute may be used to establish an industry standard, as long as
> the court determines that the employees are credible and have significant and relevant
> industry experience. This position is consistent with the holding in Molded
> Acoustical.

*Id.*, 106 Fed. Appx. At 103, discussing In re Cherrydale Farms, 2001 WL 1820323 at *5. The Fifth

Circuit standard for the objective prong is also quite flexible, requiring only a showing "that there

exists some basis in the practices of the industry to authenticate the credit arrangements at issue." In

re SGSM Acquisition Co., 439 F. 3d 233, 240 (5 Cir. 2006), *quoting* Gulf City Seafoods Inc. v.

Ludwig Shrimp Co., 296 F. 3d 363, 369 (5 Cir. 2002).

There was a showing of "some basis in the practices of the industry" to authenticate the credit

arrangements in issue. All of the witnesses testified that payment terms of up to 60 days were in use,

both in the industry and at the Friede yard. There was also more specific testimony that for net 30

invoices, it was within the custom in the industry that the payments could extend up to 60 days. As

Capt. Barrie observed payments up to 62 days would not be considered extreme, or aberrant with a

net 30 invoice. Similar factual testimony was presented by the Rodriguez representative, and by Air

Comfort's Karen Arnold who testified concerning invoice aging up to 45 and 60 days.

The foregoing analyses of time lag and industry custom should dispose of the contention that

there was unusual payment activity. Further, the governing legal standard is that payments must

grossly deviate from the norm, or be shown as extremely idiosyncratic in order for the ordinary

course defense to fail.

> [T]he Eleventh Circuit Court of Appeals has defined "ordinary business terms" as
> "the *range* of terms that encompasses the practices in which firms similar in some
> general way to the creditor in question engage," and stated "that only dealings so
> idiosyncratic as to fall outside that broad range should be deemed extraordinary and
> therefore outside the scope of subsection C [of §547(c)(2)]."

In re Terry Mfg. Co., 332 B.R. 630, 634 (M.D. Ala. 2005). For example, "a departure of 15.2 days

from the industry norm was not so 'gross' or 'unusual' as to place it beyond the scope of §547(c)(2)."
In re J. Allen Steel, *supra*, 321 B.R. at 776.  The similar Fifth Circuit definition is whether the
arrangement is too far out of line with what others do.

> Some latitude exists under the objective prong, as the court should not impose a
> single norm for transactions within an industry; the inquiry is whether "a particular
> arrangement is so out of line with what others do" that it cannot be said to have been
> made in the ordinary course.

In re SGSM Acquisition Co., 439 F. 3d 233, 239 (5 Cir. 2006), *quoting* Gulf City Seafoods Inc.
v. Ludwig Shrimp Co., 296 F. 3d 363, at 368 – 369 (5 Cir. 2002).  There was no gross or unusual
deviation as none of the payments exceeded the 60 - 62 day range in the industry, or the 32 – 58
day range between the parties.

The remaining element to be considered is whether there was any unusual payment or
collection activity.  It is not an absolute prohibition that that some collection calls are made.
Collection calls are not *ipso facto* evidence of unusual collection activity.  A creditor is not
prohibited from taking any action to collect funds, it simply may not take extreme action.  In re
Global, *supra*, 106 Fed. Appx. At 102 (Collection calls and requirement of overnight payments did
not defeat the ordinary course defense). *See also*, In re Hechinger Investment Co., 326 B.R. 282
(Bankr. D. Del. 2005);  In re Big Wheel Holding Company, 223 B. R. 669 (Bankr. D. Del. 1998).
Consistent with this standard, the President of FGH testified that the contact by Air Comfort
requesting payment was 'very professional' and there were no threats made.  None of the collection
efforts identified by the Trustee were successful, or resulted in either of the two checks on which the
preference action was based.  The collection call by Mr. Babineaux, the lien claim and stop payment
notice were all long after the January 2001 checks in issue.  The finding below should be reversed
that any unusual collection attempts by Air Comfort had a bearing on these two checks.

**III. Although the trial court correctly found that the two checks in issue were subject to setoff or extension of new value, it committed reversible error in denying application of the new value defense by its erroneous legal conclusion that the extension of new value could be reduced by post-petition payments from a third party, Ocean Rigs, made pursuant to one or more court approved Agreements.**

After the two checks in issue, Air Comfort continued to provide goods and services for construction of Bingo I and Bingo II. The substantial value of this ongoing extension of new value is undisputed as both parties to this action have produced and documented the same series of invoices.

The Fifth Circuit follows the majority rule from *Garland*[95] and "allows a given extension of new value to be applied against any preceding preference." In re Micro Innovations Corp., 185 F.3d 329, 336 (5 Cir. 1999). An analysis of the new value spreadsheets[96] should, therefore, require application of the new value defense because the new value extended after each check exceeded the amount of payment. For example, the new value of $398,957.24 after the first check for $150,319.49 was reconciled exceeds the first check; and the subsequent new value of $421,492.97 after the second check for $400,202.00 was reconciled exceeded the second check. This new value also easily exceeds the $305,609.51 determined to be in issue in the decision denying summary judgment of March 31, 2006 (Decision at p. 4)("The plaintiff does indicate that there remains a recoverable preference of $305,609.51.")

In its decision, the Trial Court apparently followed the *Garland* approach, in its analysis that "Air Comfort extended new value after each of the preferential transfers sought to be avoided that could operate as a defense. . . ." (Decision p.9). The Trial Judge committed error in reducing new value to the extent of post-petition payments by Ocean Rigs, or determination that the Estate was

---

[95] In re Thomas Garland, 19 B.R. 920, 6 Collier Bankr. Cas. 2d 1259, 8 Bankr. Ct. Dec. 1357 (E.D. Mo. 1982).

96 Here references are made to the Air Comfort new value spreadsheet (DX 1) which includes new value and invoices which were, eventually, paid by Ocean Rigs after the date of filing Bankruptcy. The FGH new value spreadsheet excludes any invoices paid, post-petition, by Ocean Rigs.

diminished.

The Fifth Circuit 'complete statement' of the new value defense is as follows:

[A] more complete statement of the (c)(4) exception would be that a creditor who raises it has the burden of proving that (1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest, and (3) the new value has not been repaid with an otherwise unavoidable transfer.

Matter of Toyota of Jefferson, Inc., 14 F. 3d 1088, 1093 n. 2 (5 Cir. 1994).

The first element should be undisputed. The new value was extended after the date of each check in question. The new value was also extended after the date of receipt of each check in question. The *Garland* approach, adopted by the Fifth Circuit, and apparently applied in the Court below, makes clear that "the date of transfer, within the context of section 547(c)(4), occurs on the date a payment by check is received by a creditor, so long as the check is not dishonored." *Garland*, *supra*, at 19 B.R. 928. Consequently, it is easily established that the first element is met. It is noteworthy, however, that there is not a material difference in result whether date of receipt or date of check is used for purposes of analysis, as some courts merely refer to the date of payment.

The second element for new value to be applied as an offset against preferences, requires that the creditor may not be secured. As noted, the Fifth Circuit has qualified new value so that "[o]nly new value that is 'not secured by an otherwise unavoidable security interest' may be used." In re Micro Innovations Corp., 185 F. 3d 329, 335 (5 Cir. 1999), *citing* §547(c)(4)(A). This qualification is not a limitation on the new value asserted by Air Comfort because the governing agreements between the parties, unequivocally, waived any lien or security interest in favor of Air Comfort. The fact that some of the invoices were paid by Ocean Rigs, a third party, is not an impediment because Ocean Rigs had also abandoned its Proof of Claim and abandoned any rights to repayment for any of the funds advanced. The Trial Court discussed the lien claim, but did not consider the effect of Air

34

Comfort's lien waiver or Proof of Claim as an Unsecured Creditor, and failed to consider evidence that Ocean Rigs abandoned any right to repayment.

The final element requires an analysis whether the new value remains unpaid by an otherwise unavoidable transfer from the Debtor; or unpaid by the Debtor (as opposed to a third party). This element is not, as FGH apparently contends, a simple inquiry whether the new value remains unpaid by any source. Air Comfort does not concede that new value must remain unpaid. Section 547 of the Bankruptcy Code was enacted in 1978 and §547(c)(4) has not changed since that time. Section 547 replaced §60 of the old Bankruptcy Act and 60(c) of the Act was replaced by 547(c) when Congress revised this section by specifically excluding the language requiring that "new value" remain unpaid. *See*, Mosier v. Ever-Fresh Foods Co., 144 B.R. 886, 890 (C.D. Cal.1992). According to 4 *Collier on Bankruptcy*, ¶547.12, pp. 547 – 57 n. 7 (15th Ed. 1992), "Section 547(c)(4) has removed the explicit requirements that the subsequent new value be given in good faith and that the new credit remains unpaid at the time of bankruptcy. Because the payments by Ocean Rigs were post-petition, the new value clearly remained unpaid at the time of bankruptcy. Case law recognizes that recovery of a preference based on §547(c)(4) should not apply to payments made post petition. MMR Holding Corp., 203 B. R. 605 (M.D. La. 1996).

The Fifth Circuit recognizes the new value defense as asserted by Air Comfort and has specified that new value is qualified to the extent it "has not been repaid with an otherwise unavoidable transfer." Matter of Toyota of Jefferson, Inc., 14 F. 3d 1088, 1093 n. 2 (5 Cir. 1994). The decision below recognized this precedent but did not properly apply it. It is inaccurate to define the issue too narrowly as simply whether the new value remains unpaid, because, as one Court noted, such a narrow focus can lead to absurd results.

> However, focusing only on the issue of whether the new value is unpaid may lead to some absurd results . . . .

35

* * *

[T]he proper inquiry directed by section 547(c)(4)(B) is whether the new value
has been paid for by "an otherwise unavoidable transfer." *In the Matter of Toyota
of Jefferson*, 14 F.3d at 1093 n. 2. This inquiry follows the *Kroh Bros.* rationale
that a creditor should not get double credit for an advance of new value.
However, instead of barring the new value defense altogether anytime new value
has been repaid, this approach allows the new value defense if the trustee can
recover the repayment by some other means.

In re IRFM, Inc., 52 F. 3d 228, 231 (9 Cir. 1995), *following* Matter of Toyota of Jefferson, Inc., 14 F.

3d 1088, at 1093 n. 2 (5 Cir. 1994). The Trustee could have sought recovery of payments by Ocean

Rigs as a post-petition preference, but failed to do so within the statute of limitations. *See*, 11 U.S.C.

§§546 – 547. Consequently the new value defense should have been allowed because the trustee

could have recovered the payment by other means. This exact analysis was applied in In re JKJ

Chevrolet, Inc., 412 F. 3d 545 (4 Cir. 2005). The Fourth Circuit reversed the lower court denial of

new value because it had been repaid by the debtor. The correct standard was, instead, whether the

new value was repaid by an unavoidable transfer. The JKJ Chevrolet Trustee failed to seek recovery

of the payment of new value. The Court held that the failure to seek recovery of an avoidable

transfer did not convert it into an unavoidable transfer:

Because the trustee *could have* avoided the transfers, those transfers were not
'otherwise unavoidable,' and thus have no bearing on Chrysler Credit's new value
defense. And, even though such a result may frustrate the intended operation of
*section 547(c)(4),* such is only the case because of the trustee's failure to recover the
avoidable post-new value payments.

In re JKJ Chevrolet, *supra*, 412 F. 3d at 552 (italics in original). Other courts have stated the rule in

more simple terms, *i.e.*, that new value need only remain unpaid at the time of filing the Bankruptcy

petition.

The Eleventh Circuit has held that *§547(c)(4)* requires that the new value remain
unpaid as of the petition date, rather than the date the court adjudicates a preference
action. *In re Braniff, Inc., 154 B.R. 773, 784 (Bankr. M.D. Fla. 1993). See In re Jet
Florida System, Inc., 841 F. 2d 1082 (11th Cir. 1988).*

36

In re Thurman Constr., Inc., 189 B.R. 1004, 1014 (Bankr. M.D. Fla. 1995). This definition of new value should apply and provide a complete defense to Air Comfort.

The trial court analysis indicated payment by a third party could reduce the new value where "the payment in question increased the third-party's secured claim against the debtor-in-possession," Decision, p. 11, *citing* In Re Kroh Bros. Dev., 930 F. 2d 648 (8 Cir. 1991). The trial court also relied on In re Formed Tubes, 46 B.R. 6435, 647 n. 4 (E.D. Mich. 1985) in its resolution of the new value issue, quoting language that payment by a third party reduced new value where the third party was secured. (Decision, p. 13). This analysis is clear error because Ocean Rigs is not secured against the Estate, and because Ocean Rigs payment did not increase its secured claim against the Estate. Instead, as noted above, Ocean Rigs has abandoned any claims whatsoever against the Estate, and this waiver and settlement was previously approved by the Bankruptcy Court. The third element should, therefore, have no bearing in this case because the new value was not paid by the Debtor, and it was not paid by an avoidable transfer. The Estate was not diminished[97] by Ocean Rigs payment of some of the new value because Friede or the Trustee will never have to repay it. In fact, the terms of the Order approving the final settlement and close out agreement, and the later order dismissing Ocean Rigs' proof of claim forecloses any repayment.

It should be also considered *res judicata* that the estate of the debtor was benefited by Ocean Rigs payments because of the express language in the Court order that settlement was in the best interest of Friede, the Estate, creditors and all parties in interest,[98] and further language that it would be "binding" on Friede, its successors, creditors, and all other parties in interest in any other State or

---

97 The trial court consideration whether the Estate was replenished should be rejected as a matter of law because this analysis is not based on the statute.
98 Court Order, DX 19 at ¶7.

Federal proceeding.[99] The "binding" nature of the comprehensive settlements, approving delivery and completion of the rigs, and related finding that the arrangement was beneficial to all parties in interest, including creditors, meets the definition of a transaction that is *res judicata* as to the parties in interest and transaction as a whole.

> When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

Restatement (Second) of Judgments §24 (1982). The specific finding that all parties received notice, was, no doubt, intended to give the Orders approving settlements preclusive effect by consent or *estoppel* See, 18A Federal Practice, §4453 *Preclusion by Consent and Estoppel by Conduct* (2002). Because Friede and other parties had concurrent interests in the subject property, Bingo I and Bingo II, the court may also give *res judicata* effect to the Orders based on theories of virtual representation, similar to a class action analysis. See, 18A, Federal Practice, §4454, *Representation – In General* (2002). Alternatively, because the comprehensive settlement as to all parties, as approved by the court, made no express reservation of preference claims, this action is barred by waiver or *estoppel*.

The approval of the settlements, and prior payments, should therefore extinguish all claims with respect to the Bingo I and Bingo II transactions, and series of connected transactions from which the later preference action arose.

A finding of *res judicata* could also be based on the approval of the Delivery and Close Out Agreement which recognized that "FGO/FGH shall owe no further obligations to Ocean Rig with

---

99 Court Order, DX 19 at ¶12.

respect to construction[100] and outfitting of Bingo 9000-1 and Bingo 9000-2 as more particularly described in the Completion Contracts (as amended)."[101] Consequently, Air Comfort has met all three elements of the new value defense.

## IV. Application of alternative defenses, even under the trial court analysis, require reduction in the award to $214,267.97.

Various defenses asserted should protect both checks in full. It is recognized "with respect to an individual payment made by the debtor during the preference period, a creditor can only benefit from one §547(c) defense" so that for a given payment "if the subsequent advance defense is utilized, a creditor cannot attempt to support part of the same payment as being in the ordinary course of business," In re SGSM Acquisition Co., 439 F. 3d 233, 242 n. 7 (5 Cir. 2006). However, Air Comfort does not wish the Court to overlook the alternative *scenario* in which, consistent with SGSM, that the Court could protect the January 19th check based on an ordinary course analysis, and a good portion of the January 29th check based on a new value analysis.

The separate defense analysis addressed in the Statement of Facts should also be considered. The application of alternative defenses as interpreted by the trial court would work as follows. With respect to the January 19th check, the first three invoices were paid in 51 days to the reconcile date. The remainder of the invoices covered by the January 19th check were paid in 45 days or less to the reconcile date. If the 45 day period is an absolute cutoff as the Trustee contended, this would reduce the $150,319.49 check by only the first three invoices paid within 51 days, which were in the amounts of $10,062.00, $2,185.00 and $608.00 respectively.[102.] The end result would be that $137,464.49 was protected and Air Comfort would have exposure for only $12,855.00 on the first

---

100 This also constitutes *de facto* assumption. *See*, discussion of MMR Holding, *infra*.
101 PX 6 at ¶5.1.

three invoices covered by the first check.

With respect to the second check, If as the Trustee contends, the alleged 'payments by Ocean Rigs with Friede Goldman's money,' should reduce new value, this would not allow recovery of the full amount awarded. The new value (paid by Ocean Rigs post petition) would reduce the new value offset for the $400,202.00 second check to $198,789.03.[103] Air Comfort exposure would be limited to $201,412.97 ($400,202.00 – 198,789.03) on the second check.

Consequently, an application of the Trustee's ordinary course analysis to the first check with $12,855.00 exposure, and applying Friede Goldman's new value analysis to the second check with $201,412.97 exposure, the maximum award, even under the arguments advanced by the Trustee, should not exceed $214,267.97. The trial court, should, therefore, be reversed in its award of $413,057.00 even if the District Court affirms its legal conclusions.

## V. The trial court recognized but failed to follow case law which should sustain the defense asserted by Appellant on ratification and *de facto* assumption, and failed to enter sufficient findings of fact and conclusions of law to address the evidence of delivery of the rigs, and completion of the contracts, and §365 of the Act.

Section 365 of the Bankruptcy Code, 11 U.S.C. §365, gives the Trustee power to ratify an executory contract within an initial period, or such additional time as the Court may allow. If the contract is rejected, it is no longer an asset of the estate. If the contract is ratified pursuant to §365, it is performed, with the further requirement that there must be adequate protection for the creditors. 11 U.S.C. §365(b). No preference action is permitted. According to the Am Jur treatise, the general elements of ratification are summarized as follows:

---

102 This calculation is easily derived from DX 4 at p. 012.

103 The spreadsheet showing application of Ocean Rigs payments (DX 6a), indicates that the following invoices would be reduced from the new value offset on the second check; Invoice numbers 30964, 30966, 30977, 31052-31056, 31085, 31105 and 31172. The calculation deleting these invoices can be made on the new value spreadsheet, DX 1.

...[A] trustee in cases filed under Chapters 7, 9, 11, 12, or 13 of Title 11 may assume or reject any executory contract or unexpired lease of the debtor. To be effective, the assumption or rejection of an executory contract or unexpired lease must be approved by a court. In addition to enabling the trustee to take advantage of those contracts or leases that will benefit the estate, the power to assume or reject certain contracts and leases enables the trustee to relieve the estate of burdensome obligations. The right to reject an executory contract is considered vital to the basic purpose of a Chapter 11 reorganization case, since the rejection of a contract or lease may release the debtor's estate from an obligation that could impede successful reorganization or allow a debtor to escape the burden of providing continuing services.

Am Jur, Bankruptcy §2338. All of the elements are met with respect to ratification of the contracts for Bingo I and Bingo II. Protection for the creditors in the Settlement and Close Out Agreement for Bingo I and Bingo II was in the form of ratifying certain direct payments that Ocean Rigs had made to vendors, in order to resolve claims for payment, and remove the rigs from the FGH facility. The Close Out Agreement was expressly made binding on all vendors and other creditors, and it necessarily follows that the protection should likewise apply to the instant litigation so that the Court should apply the terms of its prior order, and conclude that that Air Comfort is not prejudiced by Ocean Rigs' payments, and that the extension of new value is not diminished by Ocean Rigs' payments. The approval of payments in the Order approving Settlement should mean what it says, and have the effect of a §365 ratification of all prior payments to the Creditor, both by FGH and Ocean Rigs.

Here, the unequivocal terms of the Order approving settlement, treats the contracts with respect to Bingo I and Bingo II as fully performed and, it must therefore follow, that the contracts have been ratified by the Court, and that all prior payments to Air Comfort (and other vendors) in furtherance of the Bingo I and Bingo II contracts must remain undisturbed. The mutual language in the settlement, as approved by the Court, means that FGH and the Trustee cannot, at this time, long after approval of the prior payments, attempt to recover the value of the rigs as a preference, or

41

recover the value of any payments by FGH or Ocean Rigs. Likewise, Ocean Rigs may not recover on its Proof of Claim which, by related Order, has been expunged.

Where a contract is ratified or assumed pursuant to §365, preference actions are precluded. Preference actions are also precluded where there is a *de facto* or implied ratification of a contract. The decision MMR Holding Corp. v. C&C Consultants, 203 B.R. 605 (M.D. La. 1996) is directly applicable. The MMR Holding decision should require this court to reverse because the factual record clearly confirms that there was a *de facto* assumption of the Bingo contracts. The MMR decision concluded that an arrangement, post-petition, for completion of a contract by the debtor's bonding company, amounted to a *de facto* assumption, based on §365 of the Bankruptcy Code. This is the same *scenario* presented in the court below where it specifically approved delivery and completion of the drill rigs Bingo I and Bingo II post-petition.

The MMR Holding decision also held that, where the construction contract was subject of a *de facto* assumption, there could be no recovery of any pre-petition payments because the *de facto* assumption based on §365 precludes any preference actions. The following discussion should be dispositive:

> Assumption presumes curing all pre-petition default, and the act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services, retaining the post-petition amounts payable under the contract, recovery of the preference, and the resulting unsecured claims against the estate having to be thrown into the mix. Given this, it is probably more particularly correct to frame the concept as follows: pre-petition payments, which might otherwise be recoverable as preferences, are not recoverable preferences if the contract upon which the payments are based is assumed pursuant to §365, as the estate cannot simultaneously become administratively obligated for all amounts due under an assumed contract (both pre- and post-petition) and recover for the estate payments made pursuant to the contract. Without going further, it can be said without qualification that the act of assumption precludes the application of § 547(b)(5), as this provision requires the hypothetical undoing of a pre-petition transfer which has been ordered "done" (and thereby not subject to undoing, either hypothetically or in reality) by means of the court's order of assumption. Loss of the use of §547(b)(5) results, necessarily, in loss of the preference action.

42

MMR Holding, 203 BR at 612. In other words, the debtor cannot have the benefit of the contract and, at the same time, seek recovery of alleged preferential payments. This is exactly what the Trustee was permitted to do in the Court below, and reversal should be required, and a judgment rendered in favor of Air Comfort as a matter of law. This result should be easily required by the numerous Agreements, between Friede and Ocean Rigs, which indicated the intent was to have the benefit of §365[104], and the subsequent Bankruptcy Court Orders which generally approved the agreements, delivery and completion of the rigs. As a final note, while the Court orders did not contain a cite to §365 or the term "assumption," it is significant that the MMR Holding case indicated the §365 assumption of an agreement can occur *de facto, i.e.,* based on the actions of the parties without a specific §365 Court order using the word "assumption" or "ratification," which is the situation presented with Ocean Rigs.

**VI. The trial court discussed creditor earmarking primarily in the context of post-petition payments pursuant to a Remuneration Agreement, and did not fully consider the evidence that a third party Ocean Rigs had been earmarking its payments to Friede Goldman from the fall of 2000 forward which would have encompassed, and protected, the two checks written in January 2001.**

As outlined in the Statement of Facts, it is clear that from the fall of 2000 forward Ocean Rigs was directing or ear marking, payments to its vendors, particularly HVAC vendors. Courts have held that the payments so directed by a third party may not be attacked as voidable preferences.

> Application of this "creditor substitution" exception to preference recovery, which has come to be known as the "earmarking doctrine," to sustain an otherwise avoidable transfer hinges on whether or not the debtor is a true conduit for the funds supplied by the third party. If so, then those funds could not have been available to satisfy the claims of general creditors and the payment, even though nominally meeting all of the elements of section 547(b), may not be recovered.

---

104 The Agreements uniformly invoke §365: Settlement Agreement, DX 21p at ¶16.3; Cooperation Agreement, DX 21o at ¶9.3; Remuneration Agreement, PX 32b at ¶8.2.

Westlaw Commercial Bankruptcy Litigation Database (Updated Oct. 2006), Ponoroff, Snyder, Ch. 10 at §10:10 "Property of the debtor," *citing* <u>Kapela v. Newman</u>, 649 F.2d 887, 893 (1st Cir. 1981)(key question is whether assets transferred would ordinarily have been available to help satisfy claims of general creditors) (decided under former Bankruptcy Act); <u>Steinberg v. NCNB Nat'l Bank of N.C. (In re Grabill Corp.)</u>, 135 B.R. 101, 108 (Bankr. N.D. Ill. 1991)(creditors may raise defenses in a preference action other than those enumerated in §547(c)).   The <u>Grabill</u> court identified four elements that must be satisfied as a condition to application of the earmarking doctrine: (i) agreement between debtor and new creditor for repayment of antecedent debt; (ii) performance of such agreement; (iii) lack of dispositive control over the earmarked funds by the debtor; and (iv) no depletion of the debtor's estate as a result of the earmarked transfer. *Id*. At 110.

The rationale was that the funds, effectively controlled by a third party, were not generally available for all creditors so that the payments in issue should not be challenged as preferential transfers.  Consequently, the series of agreements evidencing an ongoing arrangement for Ocean Rigs to control payments to vendors on the Bingo projects, combined with testimony this was done from the fall of 2000 forward, should require this Court to reverse and render, because the Trustee can not establish that the funds paid to Air Comfort would have been generally available to other creditors.

It should be equally clear that creditor earmarking protects the funds disbursed pursuant to the Remuneration Agreement.  The Court below noted, pre-petition money went into one account, thus ruining any earmarking theory (Decision, p. 23). Applying this logic consistently, it should have required the parallel determination that the Remuneration funds were, in fact, earmarked because these funds went into a separate account in the name of Ocean Rigs, and Friede had no legal or equitable interest in the funds.  It was clear error to determine that new value was diminished by

44

earmarked funds.

## CONCLUSION AND RELIEF SOUGHT

The Court should reverse and render a decision in favor of Air Comfort.


GREGORY C. BUFFALOW
Miss. Bar # 30015
Attorney for Appellant
Air Comfort Inc.


OF COUNSEL:

MILLER, HAMILTON, SNIDER & ODOM, L.L.C.
254 State Street
Mobile, Alabama  36601
Telephone: (251) 432-1414
Fax:         (251) 433-1001

## CERTIFICATE OF SERVICE

This will certify that I have on this the 6th day of June, 2008, served a copy of the foregoing pleading either electronically by the CM/ECF filing system, or by depositing a copy of same in the United States First Class mail, properly addressed and postage prepaid to the following:

Douglas G. Walter, Esq.
Andrews & Kurth, L.L.P
600 Travis, Suite 4200
Houston, TX 77002

Douglas D. Draper, Esq.
Deborah Fallis, Counsel
Heller, Draper, Hayden, Patrick & Horn LLC
650 Poydras Street, Suite 2500
New Orleans, LA 70130

John G. Corlew, Esq.
Watkins & Eager PLLC
Post Office Box 650
Jackson, Ms 39205

David A. Wheeler, Esq.
Wheeler & Wheeler, PLLC
185 Main Street
Biloxi, MS 39530

46

## APPENDIX TO BRIEF

A. Complaint

B. Answer

C. Amended Answer

D. Decision denying summary judgment

E. Trial Decision

F. Order entering Judgment

G. Notice of Appeal

H. Docket Sheet in trial court

U:\atty\GCB\Aircomfort\Unsecured PREF\Appeal\Corrected Brief on Appeal.doc